Your argument in the following matter, VeroBlue Farms v. Canaccord Genuity, 21-2465. Hold on a second, Mr. Thank you, Your Honors, and may it please the Court. The District Court here granted the motion to dismiss on the basis of three defenses. I'd like to discuss those three defenses in this order, if I may. The imperi delicto defense, the release, and the exculpation clause in Canaccord's engagement agreement. With respect to the imperi delicto defense, which is an equitable issue where we weigh facts, Your Honor, the Kirshner case, which is an important case under New York law, says that these are case-specific issues and you do not impute the bad acts of the corporation's agents to the plaintiff when the corporation is actually the agent's intended victim. Counsel, who is plaintiff? Who is? Yes, the plaintiff is VeroBlue Farms USA. Who are they? It is an aquaculture company that was founded by these individuals who then brought in outside- I know that, but who makes up the plaintiff now? There is the remaining, when the founders were fired, and the remaining board of the company that is undergoing- So the remaining board is the plaintiff here? Essentially, we take direction from the president, Norma Cowen, and the board of directors, Your Honor. And they're the plaintiff? And they are the plaintiff, and in fact, the Northern District of Texas case, I think it's important because there, the same company, VBF, was allowed by a federal district judge to sue the founders, to treat the founders as entities separate from VBF for corporate waste and mismanagement. Did they try to do that here? When the case was transferred, that part was left in Texas? That part is going forward, Your Honor. In fact, it survived motions to dismiss. They repleted and satisfied Rule 9b, and there's discovery ongoing. And what's unusual about this case, Your Honor, is that there is discovery going on, and McCann Court, knowing that this case could potentially be reinstated, got permission to participate in the discovery in the Texas case to not only attend depositions, but ask questions in the depositions. So we are actually now litigating the case against McCann Court despite the dismissal here, and that's why we asked rather than dismissal on the pleadings where there are real issues of fact here, we should be entitled to take that and at least get to the summary judgment stage if they were to move for summary judgment or trial. I have another question, counsel. I slogged through the complaint in this case. Yes. It's long, many exhibits. Could you tell me succinctly what Vera Blue alleges that McCann Court did? Yes, Your Honor. So we allege there's two parts to this. A lot of the complaint is about the founder's conduct, and the reason for that is because McCann Court is alleged to have given substantial aid and material aid in terms of aiding and abetting and entering into a conspiracy. That's part of this case? Yes, Your Honor. Of Texas? That is the causes of action against McCann Court because those were severed and transferred here, and the detail was in large part because of the Rule 9b arguments that were made when the case was originally in Texas, including McCann Court had made a Rule 9b motion, but when it was transferred we thought it was best to nip that in the bud, even though we believe 9b doesn't even apply to allegations of conspiracy and aiding and abetting, and that there's certainly more than enough detail here. It's sort of ironic that they complain about the detail while also making Rule 9b arguments again. With respect to the imperi delicto, numerous cases have found that the adverse interest exception to imputing the corporate misdeeds of the agents cannot be rejected on the pleadings, and Kirshner itself was a case where the harm to the company came from the revelation of the fraud, not the fraud itself, but here our allegations, and we can prove this, that VBF was essentially rotting from the inside from the start, never had a chance to thrive, that VBF was the victim all along. Even Dr. Fitzsimmons, who gave reports to the founders from the get-go, understood that this was a failed venture in technology. There was no conceivable benefit. This is not a case where we are weighing benefits and detriments in terms of a net negative. I'm sorry, I thought the whole point of the fraud was to bring money into the company. Yes, Your Honor. So how is that not a situation where, at least in part, the putative agent is acting, at least in part, for the benefit of the principal? Because, Your Honor, the evidence will show that there was no possibility of this company succeeding. So what happened in this is— So you're saying there's a difference between short-term and long-term interest? You're saying bringing money into the company was in the company's—was against the company's interest? Answer the question first. Yes. Are you saying that bringing investors' money to the company was against the company's interest? Yes, Your Honor, because all of the money, whether either it lined the founders' pockets and what didn't line the founders' pockets, was dissipated and became corporate waste to the amount of $80 million. And that is what we allege. And the Conway case, which is the most recent decision of the New York Appellate Division First Department, says that just because there's a corporate existence doesn't mean there's a benefit, and that speculation of a benefit cannot defeat the adverse interest exception. Let the fact finder decide that here, if there was ever any benefit, given the evidence— Would you address the release, please? Sure, Your Honors. The release, Your Honor, New York law protects a company from contracts induced by fraud, including a release, if the fraud is separate from the conduct being released. But moreover, Your Honor— Well, the fraud has to be between the two parties to the release, right? That is—well, the fraud—no, Your Honor. That is the—they cite the Nash case and the Lodi case. So if you and I enter into a release and I have not defrauded you and you have not defrauded me, you're saying that somebody else defrauding you could void our contract? In these circumstances, yes, where you have been alleged to be aiding and abetting that fraud. The fraud in the formation of the release. Correct, Your Honor, that these are not innocent people. So in the Lodi and the Nash case— No, I'm putting aside innocent in general. What's the fraud that Canaccord conducted with respect to the release? The fraud, Your Honor, the separate fraud here— No, I'm not—I'm talking about the fraud—is there—let me ask this. No, we— Maybe we're talking about— There was a fraudulent concealment claim, but not a fraud claim against Canaccord. Okay, so are you alleging that your counterparty committed fraud in connection with the formation of the release? My understanding is that you're saying no, there was a separate fraud not conducted by Canaccord in connection with the creation of the release. Am I misunderstanding that? That is correct, Your Honor, that there was a separate fraud, but a fraud that they were certainly part in in terms of aiding and abetting and were aware of and gave material assistance to. But not a fraud directly related to the formation of the release. But, Your Honor, that is correct. But the Southern District of New York, in two recent cases— Yeah, but they don't bind us. They don't really bind us. May I ask you— Well, I understand, but they are— Is there a New York Court of Appeals case that supports your contention that the separate fraud analysis would apply in this context where it's a third party? I don't have a case that's directly on point, but you have the Southern District of New York interpreting New York law as providing— No, I understand. Yeah, but that's what we do, too. Is there a New York Court of Appeals? Is there actually— The central case. Is there an appellate division case that supports your view? Your Honor, it's really based on the fact that Centro did not specifically say that in terms of that the release—that fraud has to be between the releasee and the releasor. And the principles that the district court judges in the Romero-Aviles case and the Plantin and Beachwood case understood as being equitable. Because what the district court judge said in Romero-Aviles, I should say that considerations of equity militate against allowing an unscrupulous fiduciary to double down on a breach by taking the additional step of insulating its third party co-conspirator from any liability for the breach. But those were fraud claims between the principal and the fiduciary, right? But those were claims against the Wells Fargo advisers. Before you get to the but, just confirm for me whether—I may be wrong, but my recollection is that Centro involved a release of unknown fraud claims between the principal and the fiduciary. Is that correct or is that not correct? That is correct, but Centro says that where wrongdoing was suspected and still chose to unwind the relationship. The facts here are more like the Southern District cases, which apply in New York law, where there was no suspicion whatsoever. It wasn't until the outside investors started to become suspicious and ultimately were able to find that there was wrongdoing, fired the founders, and were able to sue the founders. And they should be able to, in these circumstances, sue the co-conspirators or the aider and abettors as well. The New York appellate division case, I think it's Lody. Yes. That said that to invalidate a contract, the alleged fraud must be between the parties to the contract or release, not between a party and his or her agent. But, Your Honor, that was a case where, and similar to the Nash case, where these were personal injury settlements where the plaintiff said that my agent, my lawyer, defrauded me into entering into this. So the defendant in those cases that settled were completely innocent, in a sense. So you're saying, though, when New York, I mean, again, it's the appellate division, which is highly persuasive authority. It's not as binding as the Court of Appeals. But when they articulate that legal principle in those terms, you're saying we should not apply that principle, that we should deduce that they only meant that principle to apply in a limited set of factual circumstances? Well, I think they only voiced it in the particular facts of that case. And, of course, Centro doesn't just simply make a decision without addressing the facts of that case. That showed that they looked very carefully at the relationship and what was suspected and not suspected. Here, there was fraudulent concealment allegations, both against the founders and against Canaccord. And, in fact, because Canaccord, we have substantial allegations, which we think we should be able to develop further in evidence, that they were manipulating financial models knowingly. They knew that this was a company that was destined for bankruptcy, but still put information and chose particular financial models and put information into what's called the data room in order to have this company and help the founders, who they had multiple business relationships with, outside of even this one relationship. We can show there were multiple business relationships and wanted to be able to just simply keep that relationship going so that we know that there was corporate waste. The founders never invested their own money. What did your client get out of this release? I'm sorry, Your Honor? What benefit did your client get from the release? Yes. So there was a fee dispute. And what's interesting about the fee dispute is that they released, there was a decision that they would pay a certain amount to Canaccord. I'm going to say what was interesting about it. What benefit did your client get from the release? From the release, Your Honor, was that Canaccord would not sue for even more fees. Yes. And what's interesting, though, about their suit. So you've reserved a few minutes for a moment. Yes, Your Honor. We'll hear from Mr. Palmer. Of course. Thank you. Thank you. Thank you, Your Honor. May it please the Court. Joseph Palmer for Canaccord Genuity. At bottom, the plaintiff's claim is incoherent. They allege that Canaccord defrauded VBF by using VBF's own information to trick VBF about VBF's own operations. And they said Canaccord did this by including that information in representations made to third-party potential investors who didn't invest. The district court correctly characterized this claim as on the line between frivolous and long shot, but found no reason, no need to determine whether it stated a claim because it found that there were three independent bases for dismissing it at the threshold. I'd like to start with Imperi Delicto, where my friend on the other side started. New York law couldn't be any clearer that Imperi Delicto is quite a robust doctrine in New York. And it clearly applies here, unless there's an exception, because the claim here is that Canaccord didn't stop VBF from committing wrongdoing. And Kirshner couldn't be clearer about how narrow the adverse interest exception is. And if you read Kirshner, which was on certification from this court, the court entertained various possibilities of loosening the adverse interest exception and rejected every single one of them. And they said that will apply only if the conduct by the agent was wholly in his own interest, and there was no benefit at all to the principle. Here, VBF has pled itself out of that exception. There is paragraph after paragraph in the complaint. We collect them at pages 44 and 45 of our brief, where the complaint says that this alleged fraud brought money into the company and allowed it to continue operating. That's the heart of the complaint. They say if — Let me ask about the other part of the allegations, as I understand it. But you can correct me if I've mischaracterized those allegations. In part, the founders lined their own pockets, to use Mr. Babin's terms. Why doesn't that fit into the adverse interest exception? It doesn't for a couple of reasons. One, Your Honor, they don't allege that Canaccord had anything to do with that. In fact, they affirmatively allege that Canaccord didn't. But just as important, there are two different categories of wrongdoing and two different categories of damages. If you look at paragraph 62 of the complaint, that makes that clear. That's on JA 68. I'm sorry, what? JA 68, paragraph 62. The complaint talks about two categories of damages. One is from this alleged looting, and the second is from the alleged misrepresentations, which they allege that Canaccord had something to do with. And then if you follow along to JA 70, paragraph 67 seeks damages for the looting. They say 5 to 10 million. Paragraph 68 seeks damages for the misrepresentations. Are these allegations that your client did these things? There's no allegation that our client had anything to do with the looting. They do allege that our client had something to do with the misrepresentations. But the point I'm trying to make is- But not the fraud? Well, certainly not the looting. But that's the nature of an abettor. Pardon me? That's the nature of an abettor. I mean, that's the allegation. That's the allegation. I think it's flawed for separate reasons we can talk about. But the point about the two categories is that shows, in quite stark language, that a big portion, in fact, the large majority of their claims involve money that came into the company and that helped it continue running. And they say if the truth had been known by BBF, query how that could have been if the founders were the CEO and the entire board, but they say if the truth had been known, the company would have shut down. Kirshner says that if the alleged misconduct brings capital into the company to allow it to continue operating, then the adverse interest exception doesn't apply. And the first department in the Congress- they helped the company? Is that what you're arguing? Well, that's their allegation, right? Their allegation is that Canaccord defrauded BBF somehow in league with the founders. It's hard to articulate what it is. Those basic questions of Mr. Babin. I had a hard time figuring out who did what to who in this case. Who did what? Why is Canaccord being sued? Who is BBF? You have to explain that a little better to me because it seems like a morass. And I read that complaint. Your Honor, we have had that question ourselves for years. The plaintiff here is the company suing Canaccord, the investment banker, for defrauding the company by tricking it into relying on its own information. It is difficult to understand. Stop me before I kill again? Something like that. And I think that's why in peri-delicto, this is a heartland and peri-delicto case. You say that, but the problem, at least for me, in connection with that doctrine, is there are allegations of the founders looting their own- or lining their own pockets and looting for their benefit. And that, arguably, at this stage, might fit into the adverse interest exemption. I disagree, Your Honor, for a couple reasons. One is there's no allegation that Canaccord had anything to do with that. They allege that it didn't. Second, if you look at the First Department's decision in Concord, there was looting there also. And nonetheless, the adverse interest exception did not apply. And that goes to the rationale of Kirchner. If there's a conflict of interest, so you have a corrupt agent that's bringing money in, both to kind of keep the company running and also because they want to skim some off of the top. They have a conflict of interest. Kirchner says that the adverse interest exception does not apply in that situation. And I think Kirchner is critical in another respect, because what Kirchner says is that the adverse interest exception to peri-delicto applies exactly as it would if, for instance, a company was sued for the acts of its agents by a third-party investor. So here, imagine one of these investors sued. That's not who the plaintiff is. The plaintiff is VBF. But imagine if an investor sued and said, I was tricked into investing in the fish farm. As I understand, because of Kirchner, the position of VBF is VBF would not be liable, because they would say, we're not responsible for the actions of our agents, because the adverse interest exception applies. Our CEO, our entire board of directors, that's on them, not on us. I think just to state that shows how wrong it is. And what Kirchner says is that we're not going to expand the adverse interest exception on the peri-delicto side of the house. We're going to keep it exactly the same as it would be if the principal were sued. And, of course, VBF would be liable for the actions of the so-called founders, the CEO, and the board of directors if it was sued, because they were the agents chosen by VBF. For the very same reasons, the adverse interest exception doesn't apply. Could you turn to the release? Yes, Your Honor. So the release is quite broadly worded. It applies to all claims, known and unknown, suspected and unsuspected, contract and tort. The conduct here falls right into the heartland of it. And under New York law, the only way to avoid this release, and some of the court's questions to my friend went to this, is to show fraudulent inducement of the release by Canaccord. Nash, Lodi are directly on point. In Nash, the principal there who was a client said, I didn't sign that release, my lawyer forged my name. And the first department said, sorry, that was not fraud by the counterparty. Maybe you have a claim against the lawyer. Here, VBF has a claim and they're pursuing against the founders. They said that doesn't void the release as against the counterparty. So they make no allegation that Canaccord fraudulently induced this release. They don't really even make an allegation if you look at the complaint about how the founders fraudulently induced the release. That's the Texas case, right? That's the Texas case, which is ongoing. And if you look at the paragraphs in the complaint about seeking rescission of the release, the reason they say the release should be rescinded is because they say, VBF didn't know about all this fraud that happened, the fraud that they're now suing about, including this Michaels email and all the rest. But New York law is quite clear, this is Centro, this is Belafont, that the failure to disclose the fraud that underlies the actual complaint, the released fraud, doesn't invalidate the fraud. If it did, you could never release unknown claims. Can I just ask procedurally to confirm what I think is your position, that if we were to agree with you on the validity of the mutual release, that would be dispositive of the entire appeal? Yes, these are three independent grounds that the district court found. And, of course, we haven't even addressed the engagement agreement, it hasn't even come up, but that's yet another reason to affirm here, because this falls right within the heartland of that as well, and it stood to reason that VBF would be responsible for the reliability and accuracy of the information about fish farming, and that the generalist investment banker, Canaccord, which played a different role, would not be held liable for any inaccuracies in that information. Thank you very much. Thank you, Your Honor. Mr. Babin. Mr. Babin, would you mind just addressing the same question I just asked your colleague, which is, if for some reason we were to agree with the appellee's position on the mutual release, would that be dispositive of the appeal? Each of these defenses itself is fully dispositive, but what's interesting, Your Honor, is that in the Romero-Villas case, they found both that the interest exception was plausible, as well as equitable principles with respect to invalidating a release. So these are related in a sense. Yes, they're independent, but the facts are related. And beyond just the separate fraud, New York law does have broad equitable principles, which we also have a separate section of our brief, against unfair contracts where there's really no ability to learn the extent of the injuries, and that's what was relied on in those cases. And so that's a whole other separate area. And if there's any question about New York law, I know Your Honor said, well, that's a district court decision. I think that once we have a full record, I didn't ask for certification because I thought New York law was straightforward here, but if there's a question about the parameters of these issues, once we have a full record, after some discovery, I think it would be easier to apply these principles, and if there's still some question, the court could always decide to certify. Let me just mention, it's not just the corporate looting. The entire corporate waste means that there was no benefit, and they facilitated that. They manipulated marketing models. They backed into the numbers. There's evidence that they juiced the numbers that allowed all this activity to take place beyond just lining. All of the corporate management, if they had not been involved, we can show more likely than not that this company, that the $80 million would not have dissipated. Let me just mention, there was a mention of the exculpation clause, if I can just very briefly. This is a contract. There's duties under the contract that can't override tortious conduct, and Canaccord did its own due diligence, which it was required to do. There's a conflict as to the meaning of this contract. The only information that they reasonably relied on, and when they got information from the leading aquaculture expert, what did they do with respect to that? Not one iota. It wasn't like they got other expert opinions saying, well, this is a good model for this company. No, they did nothing. They went along, and that's why, Your Honor, there's a relationship between all three of these defenses. The same facts underlie equitable principles, which under New York, allow us to develop these evidence and pursue our causes of action. Thank you. Thank you very much. We'll reserve decision.